## Court of Appeals.

*January*, 1886.

### PEOPLE *v.* KIERNAN.

(Affirming 3 *N. Y. Crim. Rep.* 247.)

MURDER — DELIBERATION AND PREMEDITATION.

Where the prisoner had time not only to form in his mind the purpose of killing deceased, but to announce that intention to his victim, and then carried it into effect, there was time enough for deliberation and pre-

meditation, and the jury are justified in finding that such premeditation and deliberation did exist.

The prisoner interposed a challenge to the array of jurors, on the ground that the names of the additional jurors which were ordered by the court to be drawn were not drawn from the box ordered by the court and that they were not drawn in open court. The clerk testified that there was only one box brought into court; that there was only the one box to bring and draw from; that the names of the additional jurors required by the order were drawn by him in open court and from the box directed by the court. *Held*, that if the court did not further designate the box than in the formal order which it entered, that such order was a sufficient direction. The order identified the box to be brought in and drawn from as the one containing the names of the trial jurors of said court, and the drawing having occurred in the presence of and with the assent of the court must have been from the box intended and directed by it.

APPEAL by defendant, Patrick Kiernan, from a judgment of the General Term of the Supreme Court in the Second Department, of May, 1885, affirming a conviction of defendant of murder in the first degree.

The facts appear in the report of the case at General Term (3 *N. Y. Crim. Rep.* 247) and in the opinion of the Court of Appeals.

*H. A. Montford* (*B. W. Downing*, of counsel), for the defendant, appellant.

*John Fleming*, district attorney, for the people, respondent.

FINCH, J.—The prisoner's challenge to the array was made in writing, issue taken by the district attorney upon its alleged facts; that issue tried by the court, and the challenge overruled. It averred, as the error in drawing the panel of additional jurors ordered by the court, "that the names of such jurors were not drawn from the box or boxes by the court directed, publicly, in open court, in the presence of the court as by law provided." The broadest possible construction of this language would result in an averment of but two facts; one, that the names of additional jurors were not drawn from the box directed by the court; and the other, that they were not drawn in open court.

The mode of drawing is prescribed in detail by the Code of Civil Procedure (§ 1035, &c.). There are three boxes provided for the ballots, on which are the names of the jurors selected to serve for three years. Box No. 1, at the beginning of the three years term, contains the names of all the jurors liable to be drawn. Box No. 2, as terms are held, contains the names of jurors who have been drawn and served. And box No. 3 contains duplicate ballots of the trial jurors selected, who reside in the city or town where a trial term is appointed to be held. So that box No. 1 is the ordinary source of supply, and box No. 3 is provided for an emergency, when there is no time to call jurors from a distance. As the terms proceed, the names of jurors who have served are placed in box No. 2, so that the contents of boxes 1 and 2 are continually changing. If, during the three years, the ballots in box No. 1 become exhausted, the drawing goes on from box No. 2, until the new lists are transmitted (§ 1051). When additional jurors are found necessary at a term of the court, an order is made requiring the clerk of county to draw, and the sheriff to notify, any number of trial jurors specified in the order, which the court deems necessary (§ 1058). In the present case that order was made and entered, containing all the prescribed requisites. By the next section (§ 1059) the mode of obeying the order is fixed. " The clerk must thereupon, forthwith, bring into court all the boxes wherein ballots containing the names of trial jurors are deposited as prescribed in this article, and must, in the presence of the court, publicly draw from such box or boxes, as the court directs, the number of trial jurors specified in the order." It is now said that all the boxes were not brought into court. No such omission was alleged in the prisoner's challenge. That specified no irregularity from the absence of requisite boxes, and no evidence upon the subject was needed or produced. There was no such issue, and no proof to maintain it. If the statements of the clerk that " only one box was brought into court " and that " there is only the one box to bring in and draw from," establish that the other two were not already in court, and were not brought in, the irregularity would be purely formal, and work no possible harm to the prisoner if the court selected the

box. The clerk testified that the one hundred and fifty additional jurors required by the orders were drawn by him "in open court," and "from the box directed by the court." The irregularities alleged in the challenge were thus directly disproved, and justified the court in overruling it. It is contended, however, that the court did not direct from which box the names should be drawn. The clerk swears that such direction was given, and he obeyed it. If none were given, except by the formal order entered, that was sufficient. It identified the box to be brought in and drawn from as the one "containing the names of trial jurors for said court." This language must be construed to mean the box of ordinary supply, and containing the names of all the trial jurors liable primarily to serve at that term of the court, and that could only have been box No. 1. It could, perhaps, be said that the order might have referred to either of the others, and so was ambiguous. But, conceding so much, the court must have understood its own order, and the drawing have occurred in its presence, and with its assent, must have been from the box intended and directed, we do not think that any irregularity was established.

The further argument of this appeal rested upon the facts, and the contention was urgently pressed that there was no evidence of premeditation or deliberation which warranted a verdict of murder in the first degree, and that the court erred in refusing to take that question from the jury. We have read the evidence carefully, and given it the reflection and study which the importance of the case demands, and feel constrained to say that there is evidence of deliberation and premeditation upon which it was the province of the jury to pass. The prisoner testified in his own behalf, admitting that he shot McCormick, but claiming it was unintentional, and in the heat of a struggle, in which the deceased was the assailant, and the Italian witness, Asproth, apparently coming to his assistance. In very many particulars this version of the affray was contradicted, and the jury were led to disbelieve the prisoner's evidence. There was testimony that on Saturday evening, the night before the killing McCormick, who was the prisoner's landlord, was at defendant's saloon, and threatened to dispossess him. Dr. Burnett

testified that the prisoner told him that McCormick said on
Saturday night that he would dispossess him on Monday morn-
ing.    That McCormick was in the saloon on that Saturday night,
and said something on the subject of the prisoner's leaving the
premises, is admitted by Kiernan in his testimony.    On that
night, and after McCormick left, it is claimed by the prosecu-
tion that the prisoner fired the pistol, which had remained loaded
for a long time, for the purpose of testing its reliability in a con-
templated emergency.    The prisoner says that he discharged it
in his saloon, aiming at the floor; that he did this a few nights
before the Sunday of the alleged crime; but could not say
" exactly " what night, and when asked specifically if it was the
Friday or Saturday night before, he answered: " well, I wont
say the°exact night when it was."    He added that when he went
to McCormick's there were two unexploded cartridges in the
pistol; a fact confirmed by the weapon itself after the shooting,
in which were found one loaded cartridge, three discharged
chambers, and one having no cartridge in it.    The inferences to
be drawn from this circumstance are adverse to each other, and
peculiarly the subject for the consideration of a jury.    It is
quite probable that the weapon was discharged on Saturday
night, as the prosecution claim, after the visit of McCormick.
The prisoner puts the hour at eleven, or half past eleven o'clock,
which was after the hour of that visit.    The discharge of the
pistol can scarcely have originated in other than one of two
motives.    The purpose was either to empty the weapon and
render it harmless, or to test its reliability after the length of
time during which it had remained loaded, and ascertain its
existing efficiency.    If the first of these motives was the true
one, and the prisoner meant to empty the weapon entirely, and
supposed that he had, it is inconceivable that he should make
no such explanation.    Had that been true his testimony would
have been that he drew the pistol to frighten McCormick, and
did not suppose it was loaded.    But no such explanation came
from him.    On the contrary the theory he advances as a wit-
ness assumes a knowledge on his part that the pistol was loaded,
for he claims to have fired it unintentionally.    He says, "I
didn't intend to fire it off; " "the pistol went off, but I

did not aim it at him at all;" "when McCormick had close hold of me I fired; I did not mean to shoot it off." These explanations are inconsistent with a belief on his part that the pistol was empty. If he had supposed that to be the fact, assuredly he would have said so, and stated his surprise at discovering that a charge remained in the weapon. Then, too, if on the night before, he had supposed the pistol to have been emptied and rendered useless, why should he have put it back in his pocket and carried it around with him, instead of laying it away as it appears he had often done before? And why, also, on that supposition, should he have said, before firing the fatal shot, "You or me going to die?" These facts tend, very seriously, to disprove the inference that the firing on the previous night was intended to render the weapon harmless, and so leave more probable the only other explanation, that the prisoner was testing the pistol in advance, and, as we have already said, it was the province of the jury, reasoning upon the evidence, to choose between these conflicting inferences.

Passing now to the occasion of the killing we have only the evidence of the prisoner and of the Italian to consider. That there was some altercation over the rent is made certain by both witnesses. The prisoner had with him money enough to pay the rent. He says he counted it out and offered to pay, but McCormick refused it. Either this must have been true, or the prisoner must have refused to pay the sum demanded, to account for the dispute which certainly arose. In the process of the altercation the Italian heard, as he says, the prisoner's threat, "You or me going to die." Whether the Italian told the truth, and whether as a foreigner he was sufficiently versed in our language to correctly understand what was in fact said, were subjects for the comment of counsel and the consideration of the jury. The latter heard the witness testify. They could judge how accurately or how imperfectly he understood the questions asked, and how well he could clothe his thought in the language of the country. That advantage we have not. The jury trusted in the truth and the accuracy of the witness, and we cannot say that they erred in the conclusion, although to us it appears that they might well have hesitated. Assuming, therefore, as we

must the truth and accuracy of the witness, it becomes apparent that there was time enough during the dispute and before the shooting for deliberation and premeditation within the rule as we have often stated it, even if the jury did not believe that the fatal purpose was considered and precaution taken for its success on the night before. People v. Leighton, 88 N. Y. 117; People v. Majone, 91 Id. 211; 1 N. Y. Crim. Rep. 94; People v. Conroy, 97 N. Y. 75; 2 N. Y. Crim. Rep. 565. For the prisoner had time not only to form the purpose in his mind, but to announce that intention to his victim, and then carry it into effect. After the shooting the prisoner left the house, pursued by the Italian, and turned upon him, presenting his pistol and saying, "If you come any further, I give you one." Voorhies then pursued him and he pulled up his pistol so that Voorhies could see it and said, "I will stop you." And when asked after his arrest what McCormick had done to him he declined to answer any questions. On this state of facts we see no just reason for saying that the conclusion of the jury was without evidence or unsupported by it. There were facts calling for great care on their part and very serious reflection. The prisoner was shown to be, by a large array of evidence, quiet and peaceable in his character, avoiding rather than seeking disputes or violence, and making it somewhat a matter of surprise that he should have committed the crime. But he did kill McCormick, and upon all the facts a jury have pronounced their verdict. If they had found the prisoner guilty of murder in the second degree, we should have felt it to be a safer conclusion, but have no liberty to reverse their verdict.

The judgment of conviction should be affirmed.

All concur.